UNITED STATES DISTRICT COURT
IN THE NORTHERN DISTRICT OF OHIO

DEON MCQUEEN,

    Plaintiff,

v.                                                                        HON.

UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION,

    Defendant.

## COMPLAINT

*Plaintiff, by and through his attorneys, asserts there is no other civil action pending in this Honorable Court or any other Court arising out of the same transaction and occurrence.*

Deon McQueen, by and through his attorneys, submits the following Complaint against DEFENDANT United States Drug Enforcement Administration (hereinafter referred to as "DEA" or "Defendant").

## JURY DEMAND

COMES NOW PLAINTIFF, Deon McQueen, and hereby makes his demand for trial by jury.

## JURISDICTION

1. For the majority of the events giving rise to this Complaint, Plaintiff Deon McQueen was a resident of Trumbull County, Ohio.

1

2. Defendant, United States Drug Enforcement Administration, is a U.S. agency with an office located in Youngstown, Ohio, at which Plaintiff was employed.

3. All relevant actions giving rise to this complaint took place in Mahoning County in the state of Ohio.

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331.

5. Venue of this Court is pursuant to 28 U.S.C. § 1391(b), the judicial district in which a substantial part of the events giving rise to this claim occurred.

6. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims.

## FACTUAL ALLEGATIONS

7. Plaintiff reincorporates and restates the preceding paragraphs as if fully set forth herein.

8. Plaintiff, Deon McQueen, is a Black man.

9. Plaintiff McQueen has been continuously employed in the federal civilian workforce since 2009, when he began working with the Bureau of Prisons. On January 17, 2021, he began his employment with the Drug Enforcement Administration ("DEA").

10. Despite his 12-plus years of experience in substantially similar positions, the DEA placed him on probation for the first two years of his employment.

11. Shortly after starting at the DEA, Mr. McQueen notified his superiors that his wife had a medical condition requiring access to specialized treatment. He informed them of his intent to eventually transfer to the Detroit Division Office to ensure his family's medical needs were met.

12. Because Mr. McQueen's initial assignment was to the Youngstown Resident Office, his family remained in Ypsilanti, Michigan, near the University of Michigan Medical Center for medical care.

13. In June 2021, Mr. McQueen learned that his daughter had a mental health condition requiring additional treatment and intensive monitoring. Despite his family's medical needs, Mr. McQueen remained committed to the DEA's mission, traveling weekly between Youngstown and Ypsilanti while awaiting a transfer to Detroit.

14. During his time in Youngstown, Mr. McQueen maintained open lines of communication with his supervisors to ensure that his family obligations would not interfere with DEA operations.

15. For example, when a wire operation was planned, Mr. McQueen proactively contacted Acting Resident Agent in Charge Shaun Moses to ensure that his weekly trips would not affect his availability. Mr. McQueen's Field Training

Agent, Special Agent James Deluca, assured him that his schedule would not pose an issue, as he typically had five-day workweeks with two consecutive days off.

16. Throughout the wire operation, Mr. McQueen fully reported for duty, including working additional weekend shifts requested by the agency despite his family obligations.

17. The wire operation was completed successfully without any issues related to Mr. McQueen's family obligations.

18. Mr. McQueen's dedication to the agency's mission during the wire operation was representative of his overall work performance. As a new employee, he sought guidance from experienced agents, learned from any mistakes, and gave generously of his time and effort to ensure the agency's success.

19. Despite his professionalism and dedication, certain employees took issue with Mr. McQueen, the only Black agent in the office, because he spoke out against a hostile work environment.

20. Many of his coworkers regularly engaged in discussions that reflected bias and hostility toward disenfranchised minorities, rather than focusing on their job responsibilities.

21. For example, shortly after the conviction of a police officer for the murder of George Floyd, Mr. Moses interrupted a training session to deliver a lecture condemning the verdict and describing the officer's conviction as "garbage."

22. Other agents frequently engaged in discussions about conspiracy theories concerning transgender people, their bathroom preferences, and anti-vaccine rhetoric. These conversations often devolved into complaints about seeing President Biden's portrait in the office and speculation about his assassination.

23. Because these discussions were so pervasive, Mr. McQueen altered his schedule to work earlier shifts, allowing him to avoid the hostile environment that developed in the afternoons.

24. Concerned about the impact of these conversations on agency time, morale, and reputation, Mr. McQueen reported his concerns to Mr. Moses.

25. Rather than addressing the misconduct, Mr. Moses dismissed Mr. McQueen's concerns outright, stating that such conversations were common at every DEA office and accusing Mr. McQueen of trying to "change the culture" of the office.

26. Mr. Moses, as a supervisor, had a responsibility to prevent workplace harassment and a hostile environment, yet he took no corrective action.

27. Mr. Moses's inaction emboldened Mr. McQueen's coworkers, who escalated their misconduct, now using offensive slurs directed at people with disabilities, LGBTQ+ individuals, and African Americans, including using the N-word in Mr. McQueen's presence.

28. On September 23, 2021, Mr. McQueen formally reported the misconduct to Mr. Moses and Acting Assistant Special Agent in Charge Quinn Auten.

29. Due to fear of retaliation, Mr. McQueen was reluctant to name specific individuals responsible for the discriminatory conduct. Instead of taking meaningful action, Mr. Moses used Mr. McQueen's reluctance as an excuse to permit the misconduct to continue, falsely claiming that he could not intervene without identifying the perpetrators.

30. Following his complaint, Mr. Moses and Mr. Deluca collaborated to fabricate grounds for Mr. McQueen's termination. Just days after Mr. McQueen reported the discrimination, Mr. Deluca suddenly issued a negative performance review that Mr. Moses could use as pretext for termination.

31. Prior to his September 23 report, Mr. McQueen had consistently received high performance ratings, including a perfect review on August 28 and an even stronger review on September 21, with no unacceptable performance areas.

32. However, immediately after his complaint, his September 25 review drastically changed, rating him "unacceptable" in six areas, including "understanding standards of conduct," "teamwork," and his "attitude" about the office environment—all vague and subjective categories.

33. Despite the clear retaliation, Mr. McQueen accepted the review and committed to further improving his performance.

34. However, management continued to harass him, prompting him to request a meeting to discuss the ongoing retaliation.

35. On October 7, 2021, management convened a meeting attended by Mr. Moses, Mr. Quinn, Resident Agent in Charge James Goodwin, Division Counsel John Cipriani, and Employee Advocate Tamara Wasson.

36. Instead of addressing Mr. McQueen's concerns, Mr. Cipriani attempted to impose new policies on Mr. McQueen alone, restricting his ability to travel home to care for his wife and daughter—rules not applied to white agents.

37. Management proposed requiring Mr. McQueen to report his whereabouts at all times, a policy not applied to white agents who routinely traveled for vacations and family events.

38. Mr. Moses became visibly angry when Mr. McQueen questioned the discriminatory nature of these new policies. Following the meeting, Mr. Moses refused to speak to Mr. McQueen, claiming he "didn't feel

comfortable" being alone with him and requiring a witness for all future interactions.

39. On October 13, 2021, Mr. McQueen escalated his complaint to Mr. Auten, who dismissed his concerns and made a sarcastic remark that Mr. Moses "doesn't have to curtsy" when speaking to agents.

40. On October 18, 2021, frustrated by the continued retaliation and lack of response, Mr. McQueen filed a formal EEO complaint.

41. On October 26, 2021, instead of addressing Mr. McQueen's concerns, DEA terminated him under false pretexts fabricated by Mr. Moses and Mr. Deluca.

42. After delivering the termination letter, Mr. Auten confiscated Mr. McQueen's agency-issued equipment and had him escorted from the premises.

43. On November 3, 2021, DEA second-line supervisors referred Plaintiff to the Office of Professional Responsibility, accusing him of lying and creating a hostil work environment.

44. DEA management claimed that the protected disclosures made on October 7, 2021 constituted insubordination.

45. Plaintiff filed a complaint with the EEO, which issued him a right to sue letter within 90 days of the filing of this Complaint.

46. Plaintiff requests relief as stated herein.

## COUNT I

## RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1983 (ENFORCING RIGHTS UNDER 42 U.S.C. § 1981)

47. Plaintiff incorporates by reference all preceding paragraphs.

48. Under 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983, Plaintiff has the right to be free from racial discrimination in the making and enforcement of contracts, including public employment.

49. Defendant, acting under color of state law, engaged in intentional racial discrimination against Plaintiff in violation of his rights under the U.S. Constitution and 42 U.S.C. § 1981.

50. Defendant's discriminatory actions include disparate treatment in employment, harassment, and termination based on race.

51. Defendant's conduct was part of an official policy, custom, or practice of racial discrimination, or was carried out by individuals with final policymaking authority.

52. As a direct and proximate result, Plaintiff suffered economic losses, emotional distress, and other damages.

53. Plaintiff requests relief as set forth in the Prayer for Relief.

## **COUNT II**

## **RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-3(a)**

54. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

55. At all material times, Plaintiff was an employee, and Defendant was an employer covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

56. Title VII prohibits employers from retaliating against employees who engage in protected activity, including opposing racial discrimination, reporting workplace harassment, or participating in an investigation into such discrimination.

57. Plaintiff engaged in protected activity under Title VII by opposing racial discrimination and a hostile work environment in the workplace. Specifically, Plaintiff reported racially hostile comments, racial slurs, and discriminatory treatment to his supervisors, including Mr. Moses and Mr. Auten.

58. Defendant, through its supervisors and agents, had knowledge that Plaintiff engaged in protected activity, as Plaintiff made formal and informal complaints regarding racial harassment and discrimination.

59. After Plaintiff engaged in protected activity, Defendant subjected him to adverse employment actions, including but not limited to:

    a. Issuing unjustified negative performance reviews after previously rating Plaintiff's work as satisfactory or exceptional;

    b. Fabricating pretextual reasons to discipline and ultimately terminate Plaintiff;

    c. Subjecting Plaintiff to heightened scrutiny and disparate treatment compared to his white colleagues;

    d. Restricting Plaintiff's ability to travel home, despite allowing white agents to do so without similar limitations; and

    e. Terminating Plaintiff in retaliation for making complaints about racial discrimination.

60. Defendant's retaliatory actions were intentional, willful, and taken in deliberate disregard of Plaintiff's protected rights under Title VII.

61. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered economic losses, including loss of wages and benefits, emotional distress, mental anguish, humiliation, and damage to his career and reputation.

62. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT III

## RETALIATION IN VIOLATION OF OHIO REV. CODE § 4112.02(I)

63. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

64. At all material times, Plaintiff was an employee, and Defendant was his employer covered by, and within the meaning of, Ohio Rev. Code § 4112.01(A).

65. A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

66. Defendant's conduct, as alleged herein, violated Ohio Rev. Code § 4112.02(I), which makes it unlawful to retaliate against an employee who has engaged in protected activity.

67. Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including speaking up about racial discrimination and harassment.

68. Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because he reported the issue directly to agents of Defendant.

69. After Plaintiff engaged in protected activity, Defendant's agents thereafter took adverse employment actions against Plaintiff, as alleged in the

statement of facts, including failing to promote and eventually terminating him.

70. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

71. Plaintiff notified Defendant and its agents of the unwelcome conduct and communication; however, Defendant failed to remedy the same.

72. As a proximate result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

73. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

74. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IV

## RETALIATION IN VIOLATION OF 42 U.S.C. § 1983 (ENFORCING RIGHTS UNDER 42 U.S.C. § 1981)

75. Plaintiff incorporates by reference all preceding paragraphs.

76. Under 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983, it is unlawful to retaliate against an individual for opposing racial discrimination in the workplace.

77. Plaintiff engaged in protected activity by opposing racial discrimination and/or filing complaints about such conduct.

13

78. Defendant, acting under color of state law, had knowledge of Plaintiff's protected activity.

79. Defendant retaliated against Plaintiff by subjecting him to adverse employment actions, including, but not limited to, discipline, failure to promote, and termination.

80. Defendant's actions were intentional and carried out with deliberate indifference to Plaintiff's constitutional and statutory rights.

81. As a direct and proximate result, Plaintiff suffered economic losses, emotional distress, and other damages.

82. Plaintiff requests relief as set forth in the Prayer for Relief.

## COUNT V

## RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, et seq.

83. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

84. At all material times, Plaintiff was an employee, and Defendant was an employer covered by and within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.

85. Title VII makes it unlawful for an employer to discriminate against an employee on the basis of race in hiring, promotions, compensation,

discipline, termination, and other terms, conditions, and privileges of employment.

86. Plaintiff is a Black man and, as such, is a member of a protected class under Title VII.

87. Plaintiff was subjected to discriminatory treatment by Defendant, including offensive conduct, disparate discipline, and termination, based on his race.

88. Defendant's discriminatory actions were intentional, willful, malicious, and/or taken with reckless disregard for Plaintiff's rights under Title VII.

89. The unlawful conduct substantially interfered with Plaintiff's employment and created an intimidating, hostile, and offensive work environment, as detailed in the factual allegations.

90. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered loss of earnings, loss of earning capacity, loss of fringe benefits, emotional distress, humiliation, and damage to his professional reputation.

91. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VI
## RACE DISCRIMINATION IN VIOLATION OF OHIO REV. CODE § 4112.02(A)

92. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

93. At all material times, Defendant was an employer, and Plaintiff was an employee covered by, and within the meaning of Ohio Rev. Code § 4112.01(A).

94. Defendant's conduct, as alleged herein, violated Ohio Rev. Code § 4112.02(A), which makes it unlawful for an employer to discriminate against an employee on the basis of race.

95. Plaintiff is a Black man and, as a result, is a member of a protected class under Ohio law.

96. Plaintiff was subjected to offensive communication and/or conduct on the basis of his race, including disparate treatment and termination.

97. Defendant and its agents' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard for Plaintiff's rights.

98. The unwelcome conduct and communication substantially interfered with Plaintiff's employment and created an intimidating, hostile, and/or offensive work environment as alleged in the statement of facts.

99. As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered mental anguish, emotional distress, humiliation, embarrassment, and loss of professional reputation.

100.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VII

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, et seq.

101. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

102. At all material times, Plaintiff was an employee, and Defendant was an employer covered by and within the meaning of Title VII, 42 U.S.C. § 2000e, et seq.

103. A hostile work environment under Title VII exists when an employee is subjected to severe or pervasive racial harassment that alters the conditions of employment and creates an abusive workplace.

104. Throughout his employment, Plaintiff was subjected to racially charged conversations, offensive slurs, and hostile behavior, as detailed in the factual allegations.

105. Defendant's supervisors and agents failed to take prompt remedial action and, instead, condoned and participated in the hostile conduct.

106. Plaintiff's work environment became so hostile that he was forced to adjust his schedule to avoid his co-workers and was subjected to retaliation for reporting the misconduct.

107. Despite Plaintiff's complaints about racial hostility, Defendant failed to investigate, failed to discipline the responsible individuals, and permitted the discrimination to continue.

108. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered loss of compensation, loss of career opportunities, emotional distress, and humiliation.

109. As a result of Defendant's unlawful conduct, Plaintiff has suffered damages in an amount to be proven at trial.

110. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VIII

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF OHIO REV. CODE § 4112.02(A)

111. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

112. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of Ohio Rev. Code § 4112.01(A).

113. A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions

affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

114. Defendant's conduct, as alleged herein, violated Ohio Rev. Code § 4112.02(A), which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive on the basis of race.

115. Plaintiff's work environment, as alleged in the statement of facts, made it so that any individual who reported or spoke out against Defendant's discriminatory practices faced an unworkable work environment.

116. Moreover, Plaintiff's repeated attempts to have the situation remedied, coupled with Defendant's failure to address Plaintiff's complaints, made the situation untenable.

117. The unwelcome conduct and communication was intended to, or in fact did, substantially interfere with Plaintiff's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

118. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

119. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

120. Plaintiff requests relief as described in the Prayer for Relief below.

## **RELIEF REQUESTED**

PLAINTIFF, DEON MCQUEEN, respectfully requests that this Honorable Court enter judgment against Defendant as follows:

1. Compensatory damages in whatever amount to which Plaintiff is entitled;
2. Exemplary damages in whatever amount which Plaintiff is entitled;
3. An award of lost wages and the value of fringe benefits, past and future;
4. An award of interest, costs, and reasonable attorney fees; and
5. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  March 17, 2025            Respectfully Submitted,


/s/ Sean L. Walton
Sean L. Walton (0088401)
WALTON + BROWN, LLP
395 E. Broad Street, Suite 200
Columbus, Ohio 43215
Telephone: (614) 636-3476
Facsimile: (614) 636-3453
Email:
swalton@waltonbrownlaw.com


/s/ Carla D. Aikens
Carla D. Aikens (P69530)
CARLA D. AIKENS, P.L.C.
615 Griswold St., Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com
*Attorneys for Plaintiff*